# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EXPRESS SERVICES, INC. d/b/a<br>EXPESS EMPLOYMENT<br>PROFESSIONALS, a Colorado<br>corporation,<br><br>       Plaintiff,<br><br>v.<br><br>DON G. KING, an individual,<br>EMILY D. S. KING, an individual,<br>and SOUTHERN STAFFING, INC.,<br>a Georgia corporation,<br><br>       Defendants. | Case No. CIV-15-1181-R |

## ORDER

Plaintiff Express Services ("Express") is a national company that consists of over 700 franchised locations across the United States, Canada, and South Africa. This case concerns one of its Georgia franchises, which Express alleges created a competing business in violation of a franchise agreement. Defendants have moved for summary judgment based on the statute of limitations [Doc. 108]. Express responded [Docs. 115 and 117], and Defendants replied [Doc. 118]. For the reasons that follow, some of Express's claims are untimely. The Court will therefore GRANT IN PART and DENY IN PART Defendants' Motion.

## I. Background

In November 1998, Defendants Southern Staffing, Inc., and its owners, husband and wife Don and Emily King, entered into a Franchise Agreement with Express to operate a

1

temporary personnel business in Georgia. The Franchise Agreement appeared mutually beneficial. Out of the monthly gross profit generated by the Southern Staffing franchise, Southern Staffing would receive 60% and Express the remaining 40%. And further sweetening the deal, Express was a proven company. It is, in its own words, "one of the top staffing companies in the United States and Canada." Doc. 75, at 7. In return, Mr. King and Southern Staffing agreed to develop Express services, preserve Express's confidential information on workplace management, and refrain from using software and training programs not approved by Express. And—crucial for purposes of this Motion—the Kings agreed not to operate any business competitive to Express or its other franchises.

The services that these Express and their franchises provide to their client businesses include recruiting, human resource management, and staffing. Express supplies its clients with what it terms a "contingent workforce," which consists of "temporary associates"—persons whom Express technically employs but who perform labor and services for the client. These type of employers, known as PEOs (professional employer organizations), essentially negate some of a client business's payroll duties and personnel-management responsibilities. Even though an employee labors for a PEO's client, the PEO typically pays the employee's wages and withholds his or her payroll taxes. In return, the PEO receives a fee from the client business.

Express disputes Defendants' characterizing it as a PEO, likely because it offers more than employee-leasing services. Yet there is no doubt that Express derives at least some of its business from leasing employees. For example, King and his Southern Staffing franchise entered into one such staffing agreement with Caterpillar, Inc., in 2001. The

contract called for Southern Staffing to provide temporary associates to Caterpillar to work at two of its Georgia facilities. Like most if not all of Express's staffing agreements, the contract featured an "evaluation hire" provision, which allowed Caterpillar to hire full-time one of the temporary employees it was leasing from Southern Staffing/Express once the employee had spent 540 hours on Southern Staffing's/Express's payroll. As far as the Court can tell, Southern Staffing's/Express's relationship with the temporary associate ends once a client such as Caterpillar hires the employee full-time.

Yet three years into his Franchise Agreement with Express, Mr. King saw room for growth in the employee-leasing industry. Express employed clients on a temporary basis, but perhaps there was a business opportunity for when an Express client desired to hire one of those employees full-time. So in 2001, Mr. King formed his own company, Impact Outsourcing Solutions, Inc. The company, which began operating as a PEO under Georgia law in early 2002, allegedly provides clients with employer and payroll services, human resources administration, and employee leasing.

Though it is unclear which businesses Mr. King contacted about hiring Impact, no dispute exists that in 2004 Mr. King presented to one of his Southern Staffing clients, Caterpillar, the benefits of combining Southern Staffing's temporary staffing service with Impact's new business model, which he coined "Hybrid Labor Management" or Core2. Mr. King insists that his Core2 model is distinct from Express's employee-leasing services. As he explained in his deposition, while a PEO like Express employs a client's entire workforce, Impact employs only a portion of a client's workforce. Doc. 108, Ex. 4, at 156. Impact's model is different from that of a traditional PEO because the client and the PEO

3

do not "co-employ" a client's employees. Instead, a client using Impact's Core2 program designates temporary associates it wants to hire long-term. Impact then serves as the sole employer of these employees. In short, Mr. King believes that Impact offers a solution for national companies like Caterpillar: "Caterpillar is not going to outsource 35,000 worldwide employees to a PEO, but they want a portion of their full-time workforce to be in a PEO environment." *Id*. Impact, he believes, offers companies that option.

Mr. King created and operated Impact despite the fact that the Franchise Agreement he signed in 1998 included a non-compete clause. Another contract he entered into, the Developer Agreement (in which he agreed to develop Express franchises and consult them for a fee) also included a non-compete clause. Yet whether Mr. King's conduct violates these contracts is not at issue in this Motion. The Court will assume it does for the sake of deciding Defendants' statute-of-limitations defense. That question depends on when Defendants' allegedly improper acts occurred. Defendants offer evidence that Impact was at least offering services to clients by February 21, 2005, when Impact contracted by way of a "Lease Agreement" to lease employees to Caterpillar. These employees would comprise a portion of its workforce and would perform work at one or more Caterpillar facilities. Pursuant to that agreement, on March 7, 2005, Caterpillar selected eleven of the temporary associates it was then leasing from Express/Southern Staffing and designated them for full-time hire with Impact.

The problem is that the parties' contractual relationship continued. Express claims it was unaware of Mr. King's efforts to transfer Southern Staffing's temporary associates to Impact's payroll in 2004 or 2005. Further, if it had been aware, it would not have

4

renewed and amended the Franchise Agreement in 2008 and 2013 and would have doubtlessly sued before October 19, 2015.

The Court has already dismissed Express's claim for tortious interference with contractual relations. Express's two remaining claims are for breach of the Franchise Agreement and Developer Agreement, which it says Defendants violated by offering services competitive to Express, by using Express's name, trademarks, and confidential information to solicit Express clients and employees, and by developing Impact to the detriment of Defendants' Express franchise. Defendants have moved for summary judgment based on the statute of limitations.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the basis for its motion and of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.*

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart*

*Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted). In short, the Court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). While the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party, *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–713 (10th Cir. 2014), "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. At the summary judgment stage, the Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Because the statute of limitations is an affirmative defense, *see* Fed.R.Civ.P. 8(c), a defendant moving for summary judgment has the initial burden of making a showing that the statute of limitations defense is applicable. *Blue Cross and Blue Shield of Alabama v. Weitz*, 913 F.2d 1544, 15512 (11th Cir. 1990). If it appears that statute of limitations bars the action and there is no question of material fact in connection with the statute, then the Court should grant the motion for summary judgment. *Borum v. Coffeyville State Bank*, 6 Fed. Appx. 709, *1 (Mar. 12, 2011, 10th Cir.).

### III. Analysis

Defendants' summary judgment argument is simple: the conduct Express complains of began no later than March 7, 2005, when Impact began utilizing its Core2 program to hire employees away from Southern Staffing/Express. Oklahoma law prescribes a five-

6

year statute of limitations to actions for breach of contract. Rather than sue within five years, Express waited until October 19, 2015, far past the statute of limitations.

Express counters with several reasons why its action is timely. First, the statute of limitations, if it began at all, did not begin to run until Express learned of Impact's competing business. Second, the statute of limitations cannot have lapsed because Defendants continue to breach the Franchise and Developer Agreements. Third, at least some of its actions are timely because the Agreements constitute continuing contracts that allow for a separate action, and new limitations period, for each breach. Fourth and finally, each time the parties amended the Franchise Agreement, a new contract formed, resetting the limitations period.

Because this is a diversity case, federal law determines procedural issues while state law controls substantive issues. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). A federal court sitting in diversity applies state law for statute of limitations purposes. *Burnham v. Humphrey Hosp. Reit Tr., Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) (citing *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109–110, (1945)). When an action accrues for statute of limitations purposes is a matter of state law. *Id*. (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)). The Court therefore applies Oklahoma law to the question at hand.

**A. The statute of limitations begins to run on a breach of contract claim upon the breach, not when the injured party learns of the breach.**

Express has sued under two contracts—the 1998 Franchise Agreement and the 2004 Developer Agreement, both of which contain non-compete clauses. Because those

7

agreements constitute written contracts, the statute of limitations for these claims is five years. Okla. Stat. tit. 12, § 95(A)(1). Express and Defendants agree that for an action in contract, the "cause of action accrues when a litigant first could have maintained his action to a successful conclusion." *MBA Comm. Constr., Inc. v. Roy J. Hannaford Co.*, 818 P.2d 469, 473 (Okla. 1991). Yet their agreement ends there. Defendants argue that Express could have brought this action in 2004, when Mr. King created Impact, or at least in 2005, when Caterpillar began using Impact's Core2 program to employ persons who had formerly been Southern Staffing/Express temporary associates. Express responds that it could not have sued until it learned that Mr. King was breaching the Franchise and Developer Agreements by offering Impact's competing services. When this was, though, Express refuses to say.

With this argument—that the limitations period does not commence until Express learned of the breach—Express is essentially relying on the discovery rule. As the Court explained in its earlier Order, the discovery rule typically only applies in tort cases, where courts will toll the limitations period "until the injured party knows, or, in the exercise of reasonable diligence, should have known of the injury." *See* Doc. 81, at 14–15. Because the Oklahoma Supreme Court has never definitively ruled one way or the other on whether the discovery rule applies to a standard breach of contract action, let alone a suit under a franchise agreement, this is a difficult question for the Court. The Tenth Circuit noted the lack of direction from Oklahoma courts on this issue more than two decades ago. *See Chickasaw Tel. Co. v. Sw. Bell Mobile Sys., Inc.*, 1997 WL 290951, at *3, 113 F.3d 1245 (10th Cir. 1997) (unpublished) ("While Oklahoma courts have considered specific accrual standards for certain contract and tort actions, the parties do not cite, nor have we found,

any Oklahoma cases directly addressing accrual of the type of contract and tort claims presented in this case). And indeed, Oklahoma courts have provided sparse direction since that time. Because Express's claims hinge on this question and Oklahoma authority provides no definitive answer, the Court "must endeavor to predict how [Oklahoma's] high court would rule." *Houston v. Indep. Sch. Dist. No. 89 of Okla. Cty.*, 949 F.Supp.2d 1104, 1108 (W.D. Okla. 2013).

An exhaustive review of Oklahoma authority convinces the Court that the discovery rule does not apply to breach of contract claims. Several observations underlie that conclusion.

For starters, the Oklahoma Supreme Court has never discussed the discovery rule as an element of contract law. Instead, it notes that the discovery rule is a feature of tort law. S*ee, e.g., Reynolds v. Porter*, 760 P.2d 816, 820 n.8 (Okla. 1988) (explaining that the discovery rule "allows limitations in *tort cases* to be tolled until the injured party" learns of, or should have learned of, the injury") (emphasis added); *see also Calvert v. Swinford*, 382 P.3d 1028, 1033 (Okla. 2016) ("A cause of action accrues when the injury occurs. However, Oklahoma also follows the discovery rule *allowing limitations in certain tort cases* to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury.") (emphasis added).

Second, the Oklahoma Supreme Court has twice had the opportunity to apply the discovery rule to a claim for breach of contract—albeit a construction contract—and twice declined to do so. *See Samuel Roberts Noble Found., Inc. v. Vick*, 840 P.2d 619, 623 (Okla. 1992); *see Kirby v. Jean's Plumbing & Air*, 222 P.3d 21, 27 (Okla. 2009). In *Vick*, for

example, it ruled that the limitations period commenced upon completion of a plumber's installation of a defective sewer line—not eleven years later when the plaintiff homeowner discovered them. 840 P.2d at 622. Its reasoning there, that "under a discovery rule, a defendant [builder] is never completely certain that time has extinguished his liability," *id.*, seems equally relevant here. Under Express's theory, Mr. King and other franchise owners could never be certain that their business ventures were in accordance with the franchise agreement. A franchisee might carry on for years, even decades, before a franchise like Express decided to sue.

Aside from these cases, however, the Oklahoma Supreme Court has offered no direction. That said, one concurring justice did remark, in a case for failure to pay mineral royalties, that "we don't have a 'discovery rule' for breach of contract. Something would have to toll the statute." *Goodall v. Trigg Drilling Co.*, 944 P.2d 292, 296 (Okla. 1997) (Summers, J., concurring). And while this is far from conclusive, lower courts in Oklahoma and federal courts have generally declined to apply the discovery rule to breach of contract claims. The Oklahoma Court of Civil Appeals, for instance, not only refused to apply the rule to a contract action for unpaid electrical services, but also noted that "the 'discovery rule', for purposes of tolling the statute of limitations, is applicable to tort cases." *Kiamichi Elec. Co-op. v. Underwood*, 842 P.2d 358, 358 (Okla. Civ. App. 1992). Federal courts have gone further, holding that the discovery rule is simply inapplicable to breach of contract actions. *See, e.g., Southcrest, L.L.C. v. Bovis Lend Lease, Inc.*, 2010 WL 4053544, at *3 (N.D. Okla. Oct. 14, 2010) ("[C]ourts have long rejected the extension of the discovery rule to breach of contract claims."); *Wilson v. Johnson*, No. CIV-05-0921-F, 2006 WL

1555809, at *3 n.5 (W.D. Okla. June 5, 2006) ("The discovery rule which applies to tort claims in Oklahoma does not apply to claims based on contract theories of recovery.").

In short, while this issue is far from resolved, the majority if not all authority suggests that the limitations period for a breach of contract action commences upon the breach, not when the injured party gains notice. Because the Court must forecast how Oklahoma's highest court would rule, it will not apply the discovery rule here.

Part of that decision stems from Express's failure to cite any case in which an Oklahoma court applied the discovery rule in a breach of contract action. This is not to say that Express does not try. It relies on *Kinzy v. State ex rel. Oklahoma Firefighters Pension & Ret. Sys.*, 20 P.3d 818 (Okla. 2001). There, firefighters sued the state for its alleged failure to pay them properly calculated retirement benefits from a state public trust. *Id.* at 820–21. The Oklahoma Supreme Court held that their claims were barred because the statute of limitations began to run "upon [the firefighters'] first acquiring notice of the facts which would support a breach-of-contract claim against [the pension] System that the class could have sued." *Id.* at 823. While no Oklahoma court has ever interpreted *Kinzy* as holding that the discovery rule applies to breach of contract claims, Express cites the case for that precise proposition.

To be fair, the Oklahoma Supreme Court in *Kinzy* did in fact construe the firefighters' breach of trust claims as contractual in nature before applying a five-year limitations period. *Id.* at 823. But *Kinzy*'s similarities to this case generally end there. For one, the parties in *Kinzy* were not arguing over the merits of applying the discovery rule to all breaches of contract, or even all breaches of a trust. Their dispute was not over whether

the limitations period commenced upon the state's failure to pay retirement benefits (the actual breach) or when the firefighters learned of that failure. *Id*. at 822. The lone issue was whether the limitations period for claims against private and public trusts commenced at the same time. As the *Kinzy* court explained, for claims based on breach of a private trust, the limitations period commences as soon as the trustee repudiates the trust. *Id.* at 823. That, however, could never be the rule for claims based on breach of a *public* trust because that would require the trustee—a public entity and agent of the state—to repudiate a trust, an illegal action under state law and thus impossible. *Id*. at 823–24. The pensioner firefighters thus had to sue when they learned that the state would not pay their benefits, not when the Pension Board repudiated the trust, which would never happen. *Id.* at 824.

If *Kinzy* has value, then it is in the trust context in which it was decided. Indeed, the Oklahoma Supreme Court continues to cite it in that context. *See, e.g., Smith v. Baptist Found. of Oklahoma*, 50 P.3d 1132, 1137 n.8 (Okla. 2002) (citing *Kinzy* for the principle that "the statute of limitations begins to run on a trust beneficiary's claims when it learns it has suffered damage that might be the trustee's fault"); *Nichols v. Nichols*, 222 P.3d 1049, 1055 n.19 (Okla. 2003) (relying on *Kinzy* for the proposition that a "trustee cannot repudiate a statutory trust."). Given this, along with no state court ever having relied on *Kinzy* to toll the limitations on a standard breach of contract claim, the Court will not employ *Kinzy* to toll Express's claims here.

And without *Kinzy*, Express cannot marshal any support for its argument that the discovery rule applies. In fact, the other Oklahoma cases it cites for the discovery rule all rely on *Kinzy* and involve claims for state pensions. *See Bordwine v. Oklahoma Firefighters*

*Pension & Ret. Sys.*, 99 P.3d 703, 704 (Okla. Civ. App. 2004); *Steelman v. Oklahoma Police Pension & Ret. Sys.*, 128 P.3d 1090, 1093 (Okla. Civ. App. 2005). Put simply, whether Express had notice of the alleged breach does not matter for purposes of deciding when its claims accrued.

Express believes that this is an absurd result; if the statute of limitations commences upon the breach, then nothing is to stop a person from covertly breaching a contract until the statute of limitations runs. But even a quick survey of state law reveals that many states decline to apply the discovery rule to breach of contract claims. *See, e.g., Dunn v. Dunn*, 281 P.3d 540, 548 (Kan. Ct. App. 2012) ("A cause of action for breach of a written contract . . . accrues at the time of the breach, regardless of when the breach is discovered or is discoverable."); *Med. Jet, S.A. v. Signature Flight Support-Palm Beach, Inc.*, 941 So.2d 576, 578 (Fla. Dist. Ct. App. 2006) ("Florida has followed this general rule that a cause of action for breach of contract accrues at the time of the breach, not from the time when consequential damages result or become ascertained."); *Scherer v. Hellstrom*, 716 N.W.2d 307, 310 (Mich. Ct. App. 2006) ("In Michigan, a breach of contract claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results."); *Cavanaugh v. City of Omaha*, 580 N.W.2d 541, 544 (Neb. 1998) (A "cause of action in contract accrues at the time of the breach or failure to do the thing that is the subject of the agreement," even though "the plaintiff may be ignorant of the existence of the cause of action."); *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 490–91 (Alaska 1975) ("[The statute of limitations] begins to run in contract causes of action" at "the time of the breach of the agreement, rather than the time that actual damages are

sustained as a consequence of the breach."). Commencing the limitations period upon Impact's breach, then, is not the remarkable position that Express makes it out to be.

**B. Express's first breach of contract claim accrued in 2005.**

The limitations period on Express's claims thus began to run when the breach occurred. But when was that? Defendants argue it was when King formed Impact in 2004, or at the latest, shortly after when Impact hired the eleven Caterpillar employees that had been co-employed by Southern Staffing/Express. Express contends that Defendants' alleged breach of contract involves more than this conduct. In fact, Express argues that Defendants are oversimplifying its claims in order to bolster their statute of limitations defense.

If Defendants have overgeneralized Express's claims, perhaps they can be forgiven. Express's allegations concerning which conduct of Defendants' breached the Agreements could be clearer. Express will not identify which Express employees were inappropriately solicited and when, how Defendants solicited these employees and shared confidential information, when Defendants first breached the Agreements, or even the specific provisions of the Agreements that Defendants allegedly breached.

As best as the Court can tell, this lawsuit is at bottom about Mr. King's forming Impact and its new business model. Express President and Co-founder Bill Stoller testified in his deposition that "this case is about [Defendants'] moving Express associates to Impact's payroll." Doc. 108, Ex. 1, at 187. And he conceded that Express would have first been harmed when Impact hired an Express temporary associate. *Id*. So if this case is about more than the Mr. King's forming and operating Impact, Express's own filings suggest

otherwise. Its Response to Defendants' Motion for Summary Judgment consistently singles out Mr. King's operating Impact.[1]

King formed Impact in 2001. The company billed its first Core2 client in 2004. Defendants have offered March 7, 2005, as the point at which their conduct—to the extent it constituted a breach—began. Consequently, no genuine dispute exists as to whether a claim for breach of contract accrued at that time. Yet even if a cause of action accrued then, this does not foreclose the possibility that later instances of breach gave rise to new causes of action.

## C. The Franchise Agreement and Developer Agreement constitute continuing contracts that allow for partial breaches and new limitations period upon each breach.

Perhaps realizing that Defendants' allegedly improper conduct began in 2005, Express offers alternative theories for why its claims are timely: one, Defendants' breach is ongoing and has not ceased, and two, the Agreements constitute continuing contracts, thus allowing Express to bring a new cause of action for every separate "breach" by Defendants.

Express's first notion, what courts have termed the "continuing-wrong theory," is one that the Oklahoma Supreme Court has only acknowledged in the tort context. *See Wing v. Lorton*, 261 P.3d 1122, 1126 n.1 (discussing the theory in the medical malpractice

---

[1] *See, e.g.*, Doc. 17, at 11 ("SSI/King and King's separate company, Impact, are continuing to breach the Franchise Agreement as amended and renewed and transfer Express associates to Impact through 2017."); *id*. at 14 ("Defendants offer limited summary judgment evidence which they contend shows . . . that King did not hide the HLM/Core2 program from Express."); *id*. ("In the most generous light, Defendants have shown only that Express knew Defendants were operating a PEO of some kind."); *id*. at 15 ("King intended to implement or had initiated a program that would systematically divert the Express associates under his control from his Express franchises to his other company.").

context and explaining that it applies "where a *tort* involves a continuing or repeated injury, [in which case] the cause of action accrues at, and limitations begin to run from, the date of the last injury") (citing 54 C.J.S. Limitation of Actions § 177 (1987)). Under the continuing-wrong theory, "the statute of limitations does not begin to run until the wrong is over and done with." *Id*. (*citing Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983)). Under this theory, the limitations period on Express's claims have not even commenced because Defendants' breach is ongoing. Express, though, never mentions the continuing-wrong doctrine, and the Court cannot locate any case in which an Oklahoma court applied it in a contract action.

At any rate, the continuing-wrong doctrine stands in contrast to the continuous-accrual doctrine, which treats each breach as an "an independently actionable wrong with its own time limit for recovery," meaning that it "supports recovery only for damages arising from those breaches falling within the limitations period." *Aryeh v. Canon Business Solutions*, Inc., 292 P.3d 871, 880 (Cal. 2013). "Generally speaking, continuous accrual applies whenever there is a continuing or recurring obligation." *Id*. And according to Express, that is precisely what the Franchise and Developer Agreements created. Consequently, each time Defendants breached the contract, a new cause of action arise, each of which had its own limitations period.

Of course, for the continuous-accrual doctrine to apply, Express has to demonstrate that the Agreements did in fact create continuing obligations. The Court is satisfied that it has. As the Tenth Circuit has pointed out, Oklahoma courts recognize the concept of a "continuing contract":

> There are contracts, however, that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made. These contracts too are capable of a series of 'partial' breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go 'to the essence' and to frustrate substantially the purpose for which the contract was agreed to by the injured party. For each 'partial' breach a separate action is maintainable, just as in the case of an 'instalment' contract; and for a series of 'partial' breaches occurring before any action is brought only one action is maintainable.

*Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 255–56 (10th Cir. 1981) (citing 4 A. Corbin, Corbin on Contracts § 956, at 841 (1951)).

While Oklahoma courts have not addressed whether a franchise agreement creates continuing obligations, they have found continuing obligations in a variety of other contexts. *See, e.g., Indian Territory Illum. Oil co. v. Rosamond*, 120 P.2d 349, 352–353 (Okla. 1941) (finding an oil and gas lease created a continuing obligation to protect adjacent land from drainage); *Western Natural Gas Co. v. Cities Service Gas Co.*, 507 P.2d 1236, 1241–1242 (Okla. 1972) (construing the obligation in sale to make full and fair disclosure to government agencies as a continuing covenant); *Bowman v. Oklahoma Natural Gas Co.*, 385 P.2d 440, 47 (Okla. 1963) (construing seller's representations that repairs will make the subject goods comply with a warranty as continuing covenant); s*ee also Paul Holt Drilling, Inc.*, 664 F.2d 252 at 256 (deeming an insurer's duty to defend to be a continuing obligation under Oklahoma law). Because each breach of these obligations gives rise to a new cause of action, a plaintiff can only recover damages for those breaches within the limitations period. So if the Franchise and Developer Agreements impose a

17

continuing obligation on Defendants, Express's damages are limited to those incurred within five years of its filing suit.

Faced again with a less-than-clear issue under Oklahoma law, the Court does agree with Express that the Franchise and Developer Agreements constitute continuing contracts. Though none of these Oklahoma cases deal with franchise agreements, other courts have found that non-compete clauses, like the ones here, create continuing obligations. *See, e.g., Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed.Appx. 552, 557 (4th Cir. 2015) ("[T]he continued operation of a competing enterprise can constitute breach of a contractual obligation so long as the contract under which the obligation arose is valid and in effect."); *Sparano v. Southland Corp.*, 1996 WL 272515, *2 (N.D. Ill., May 17, 1996) ("Plaintiffs are correct to identify the franchise agreements as continuous contracts since the franchise agreements call for the provision of continuous services (advertising, maintenance, etc.) to the franchisees by defendants."); *Segall v Hurwitz*, 339 N.W.2d 333, 343 (Wis. Ct. App. 1983) ("The covenant not to compete and the agreement not to use the business name for five years imposed continuing duties on [the parties] during that period."); *but see Pinnacle Pizza Co. v. Little Caesar Enterprises, Inc.*, 598 F.3d 970, 978 (8th Cir. 2010) (finding that franchise's repeated use of franchisee's original advertising materials constituted a single breach for statute of limitations purposes that accrued upon the first use of the advertising materials). The Court is therefore satisfied that the Franchise and Developer Agreements imposed continuing obligations upon the parties. Each time that Impact allegedly stole an Express temporary employee, this constituted a new breach. Express has submitted a 156-page document listing the names of all Express temporary

associates that were allegedly hired by Impact in the five years preceding this suit. Express's claims are therefore timely to the extent they seek to recover damages for Impact's hiring of these employees and untimely to the extent they seek to recover damages for those employees Impact hired more than five years before this suit.

## IV. Conclusion

In review, any breach of contract claims that accrued prior more than five years before this suit are barred. Because the Franchise and Developer Agreements constitute continuing contracts, each independent "breach" by Defendants gave rise to a new cause of action subject to its own limitations period.

Defendants' Motion for Summary Judgment is therefore GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED this 30th day of August 2017.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE